**Case No. 25-20125**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

Staci Barber,

Plaintiff – Appellee

v.

Bryan Scott Rounds, Principal Of Cardiff Junior High, Sued In
His Individual And Official Capacities,

Defendant - Appellant

---

On Appeal from the United States District Court For the Southern District of Texas
Civil Action No. 4:24-cv-1004

---

## APPELLANT'S BRIEF

---

Christopher B. Gilbert
Alexa Gould
Thompson & Horton LLP
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
Telephone: (713) 554-6744
Facsimile: (713) 583-8884

ATTORNEYS FOR APPELLANT

i

# CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

**Appellant/Defendant**:   Bryan Scott Rounds, Principal Of Cardiff Junior High, Sued In His Individual And Official Capacities

**Defendant**:   Katy Independent School District

**Counsel for Appellant/**:   Christopher B. Gilbert
**Defendants**   Alexa Gould
Thompson & Horton LLP
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
Telephone: (713) 554-6744
Facsimile: (713) 583-8884

**Appellee/Plaintiff**:   Staci Barber

**Counsel for Appellees**:   Brett B. Stalcup
STALCUP LAW
3811 Turtle Creek Blvd. Suite 175
Dallas, Texas 75219
Email: bstalcup@stalcuplaw.comJay
Alan Sekulow
Jordan Sekulow
Stuart J. Roth
Christina A. Compagnone
Geoffrey Surtees
Nathan Moelker
AMERICAN CENTER FOR LAW AND JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Email: nmoelker@aclj.org

/s/ Christopher B. Gilbert
Christopher B. Gilbert

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Bryan Scott Rounds requests oral argument in this matter, due to the important and novel questions of law raised by the lower court's opinion. Rounds, a school principal, was denied qualified immunity below on a First Amendment claim. The lower court held that *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) clearly establishes that Rounds's conduct violated Barber's First Amendment rights, despite the undisputed fact that Barber sought to pray *with* students – thereby making *Kennedy* not applicable to this case. Moreover, because *Kennedy* changed the test for Establishment Clause violations, the law regarding both free speech and free exercise by employees while at school is not clearly established. This case also raises questions about the interplay between the Equal Access Act and the First Amendment under *Kennedy*, an issue that was completely overlooked by the lower court. Because the decisional process would be significantly aided by oral argument, Appellant Rounds respectfully requests said argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES .................................................................. ii

STATEMENT REGARDING ORAL ARGUMENT ...................................................... iii

TABLE OF CONTENTS ............................................................................................... iv

TABLE OF AUTHORITIES ........................................................................................... v

STATEMENT OF JURISDICTION ............................................................................... 1

STATEMENT OF THE ISSUE ....................................................................................... 2

STATEMENT OF THE CASE ........................................................................................ 2

    A.  Course of Proceedings and Disposition in the District Court .......................... 2
    B.  Statement of Facts ............................................................................................ 3

SUMMARY OF THE ARGUMENT ............................................................................... 6

STANDARD OF REVIEW .............................................................................................. 7

ARGUMENT & AUTHORITIES .................................................................................... 8

    A.  Qualified Immunity Standard ........................................................................... 9
    B.  Rounds was entitled to qualified immunity below, because the facts of this case differ significantly from those of *Kennedy*. .......................................... 11
    C.  Rounds was entitled to qualified immunity below, because his conduct was in line with the Equal Access Act .................................................................. 15
    D.  Rounds was entitled to qualified immunity below, because the lower court incorrectly found that *Kennedy* clearly established that Rounds's conduct violated Barber's constitutional rights. ................................................. 17
    E.  Rounds was entitled to qualified immunity below on Barber's Fourteenth Amendment claims, because no facts were alleged that Rounds personally was involved in drafting the Employee Handbook, or that Rounds personally was motivated to treat Barber differently because of her religious activities. ....................................................... 25

CONCLUSION AND PRAYER ..................................................................................... 27

CERTIFICATE OF SERVICE ...................................................................................... 29

CERTIFICATE OF COMPLIANCE ............................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Eeds*
   392 F.3d 138 (5th Cir. 2004) ...................................................................... 10

*Anderson v. Creighton*
   483 U.S. 635 (1987) ................................................................................ 10

*Ashcroft v. al–Kidd*
   563 U.S. 731 (2011) ............................................................................... 10

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ........................................................................... 7, 26

*Balistreri v. Pacifica Police Dept.*
   901 F.2d 696 (9th Cir. 1988) ...................................................................... 7

*Beavers v. Metropolitan Life Ins.*
   *Co.*, 566 F.3d 436 (5th Cir. 2009) .............................................................. 7

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007) ................................................................................. 7

*Blackburn v. City of Marshall*
   42 F.3d 925 (5th Cir. 1995) ........................................................................ 7

*Borden v. School District of the Township of East Brunswick*
   523 F.3d 153 (3rd Cir. 2008) ................................................................... 23

*Brumfield v. Hollins*
   551 F.3d 322 (5th Cir. 2008) ...................................................................... 8

*Camreta v. Greene*
   563 U.S. 692 (2011) ............................................................................... 17

*Club Retro, L.L. C. v. Hilton*
   568 F.3d 181 (5th Cir. 2009) ...................................................................... 8

*Daugherty v. Vanguard Charter Sch. Academy*
   116 F.Supp.2d 897 (W.D. Mich. 2000) .......................................................... 20

*De La Paz v. Coy*
   786 F.3d 367 (5th Cir. 2015) ........................................................................ 7

*Doe v. Duncanville ISD*
   70 F.3d 402 (5th Cir. 1995) ................................................................... 22, 23

*Doe v. Wilson County School System*
   564 F.Supp.2d 766 (M.D. Ten. 2008) ..................................................... 21, 22

*Fennell v. Marion Indep. Sch. Dist.*
   804 F.3d 398 (5th Cir. 2015) ...................................................................... 27

*Fernandez-Montes v. Allied Pilots Ass'n*
   987 F.2d 278 (5th Cir. 1993) ....................................................................... 7

*Fraser v. Bureau of Alcohol, Tobacco, Firearms and Explosives*
   672 F.Supp.3d 118 (ED Va. 2023) .............................................................. 19

*Fulton v. Philadelphia*
   593 U.S. 522 (2021) .................................................................................. 15

*Gallentine v. Housing Authority of City of Port Arthur, Tex.*
   919 F.Supp.2d 787(E.D. Tex. 2013) ........................................................... 26

*Garcetti v. Ceballos*
   547 U.S. 410 (2006) .................................................................................. 16

*Harlow v. Fitzgerald*
   457 U.S. 800 (1982) .................................................................................... 9

*Hunter v. Bryant*
   502 U.S. 224 (1991) .................................................................................. 10

*In re Baker Hughes Securities Litigation*
   136 F.Supp.2d 630 (S.D. Tex. 2001) ............................................................ 7

*Kennedy v. Bremerton School District*
   597 U.S. 507 (2022) ..........................................................................passim

*Kincade v. City of Blue Springs, Mo.*
  64 F.3d 389 (8th Cir. 1995) ........................................................ 20

*Kinney v. Weaver*
  367 F.3d 337 (5th Cir. 2004) ..................................................... 19

*Lee v. Weisman*
  505 U.S. 577 (1992) ................................................................... 13

*Longoria v. San Benito Indep. Consol. Sch. Dist.*
  942 F.3d 258 (5th Cir. 2019) ..................................................... 17

*Mahanoy Area Sch. Dist. v. B. L.*
  594 U.S. 180 (2021) ................................................................... 18

*Malley v. Briggs*
  475 U.S. 335 (1986) ................................................................... 10

*McClelland v. Katy Indep. Sch. Dist.*
  63 F.4th 996 (5th Cir.) ............................................................... 18

*Mitchell v. Forsyth*
  472 U.S. 511 (1985) ............................................................... 1, 11

*Morgan v. Swanson*
  659 F.3d 359 (5th Cir. 2011) ..................................................... 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
  597 U.S. 1 (2022) ....................................................................... 19

*Noyola v. Texas Dep't of Human Res.*
  846 F.2d 1021 (5th Cir. 1988) ................................................... 19

*Pearson v. Callahan*
  555 U.S. 223 (2009) ................................................................ 9, 15

*Pierce v. Smith*
  117 F.3d 866 (5th Cir. 1997) ............................................ 8, 10, 14

*Rivas-Villegas v. Cortesluna*
    595 U.S. 1 (2021) ........................................................................... 25

*Roake v. Brumley*
    141 F.4th 614 (5th Cir. June 20, 2025) ........................................ 17

*Roberts v. City of Shreveport*
    397 F.3d 287 (5th Cir. 2005) ........................................................ 26

*Salas v. Carpenter*
    980 F.2d 299 (5th Cir. 1992) .......................................................... 8

*Santa Fe Indep. Sch. Dist. v. Doe*
    530 U.S. 290 (2000) ...................................................................... 13

*Sease v. Sch. Dist. of Philadelphia*
    811 F. Supp. 183 (E.D. Penn. 1993) ........................................... 16

*Siegert v. Gilley*
    500 U.S. 226 (1991) ........................................................................ 9

*Stefanoff v. Hays Cnty.*
    154 F.3d 523 (5th Cir. 1998) ........................................................ 10

*Stone v. Graham*
    449 U.S. 39 (1980) ........................................................................ 17

*Town of Greece v. Galloway*
    572 U.S. 565 (2014) ...................................................................... 18

*Vincent v. City of Sulphur*
    805 F.3d 543 (5th Cir. 2015) .......................................................... 9

**Statutes**

20 U.S.C. § 4071(a) ............................................................................. 16

20 U.S.C. § 4071(c)(3) ..................................................................... 8, 16

28 U.S.C. § 1291 .................................................................................. 1

Tᴇx. Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ § 110.003 ........................................................................ 2

**Other Authorities**

2A *Moore's Federal Practice* § 12.07 ........................................................................ 7

# STATEMENT OF JURISDICTION

This case is an appeal from the denial of qualified immunity to Appellant Bryan Scott Rounds, a Defendant in the matter below. Rounds's Motion to Dismiss on the basis of qualified immunity was denied by order of United States District Judge Alfred H. Bennett, United States District Court for the Southern District of Texas, Houston Division, entered on March 26, 2025. [ROA.382-396]. Appellate jurisdiction in the Court of Appeals is proper under 28 U.S.C. § 1291 and *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), which states that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Appellant Rounds's Notice of Appeal was filed on April 9, 2025. [ROA.430].

## STATEMENT OF THE ISSUE

Whether Rounds was entitled to qualified immunity below, because the lower court incorrectly found that *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) created clearly established law in the context of a principal instructing a teacher not to pray with students at a student-led event.

## STATEMENT OF THE CASE

### A.    Course of Proceedings and Disposition in the District Court

Appellee Staci Barber sued Defendants Katy Independent School District and Bryan Scott Rounds, alleging Defendants prevented her from participating in the "See You at the Pole" ("SYATP") event in September 2023. [ROA.8-29]. Barber claims that the conversations regarding the 2023 SYATP event with Rounds violated her First Amendment rights to free speech (Count 1) and free exercise (Count 2), her due process rights (Count 3) and her equal protection rights (Count 4) under the Fourteenth Amendment, her corresponding constitutional rights under the Texas Constitution (Count 5), and her rights under the Texas Religious Freedom Restoration Act, TEX. CIV. PRAC. & REM. CODE § 110.003 (Count 6). [ROA.8-29].

On April 16, 2024, Barber filed a Motion for Preliminary Injunction based on her First Amendment free speech and free exercise claims. [ROA.46-67]. The district court heard oral arguments on the motion on May 14, 2024, and denied Barber's motion on May 28, 2024. [ROA.350-355]. Defendants moved to dismiss Barber's claims, and Rounds asserted his entitlement to qualified immunity on April 18, 2024. [ROA.191-

220]. On March 26, 2025, the district court denied Defendants' motion to dismiss. [ROA.382-396]. Rounds timely appealed. [ROA.430]. The claims against the District remain pending in the district court, and the district court stayed all proceedings pending the resolution of this appeal. [ROA.480-485].

## B.    Statement of Facts

SYATP is a student-led and student-initiated prayer activity that occurs at school flagpoles on the fourth Wednesday in September. [ROA.11]. SYATP in 2023 was scheduled for Wednesday, September 27, 2023. [ROA.12]. On September 26, 2023, Rounds approved the student group Fellowship of Christian Athletes ("FCA") to lead SYATP from 8:00 to 8:40 am. [ROA.254]. That same day, Rounds sent the following email to staff about SYATP:

> See You At The Pole, a nationally recognized day of <u>student initiated, student-led prayer</u>, will be tomorrow, Wednesday, September 27th. For the school district, this student gathering is treated like a student-led, non-curricular club that might meet before or after school. If you have students asking about whether or not they can have a See You At The Pole event, please send them to me to complete the proper approval process. Student participation at SYATP is limited to non-instructional time, meaning prior to the start of instruction at 8:55 AM or after the end of the instructional day of 4:05 PM. Participation should not cause students to be tardy to class.

> Per School Board policy FNAB(Local), district personnel shall not promote, lead, or participate in the meetings of non-curriculum-related student groups. Staff members are limited to serving as group monitors only for non-curricular groups. I also want to remind us that Board Policy prohibits staff members from leading students in prayer or praying with or in the presence of students. Our role would be to serve only as monitors of a <u>student-led</u> event. The information below can be found on page 24

of the KISD Employee Handbook. If you have any questions, please let me know. Thank you.

[ROA.12,179].  He sent similar emails in previous years. [ROA.253]. After Barber sent an email to staff inviting them to pray at the pole at 8:00 am, Rounds allegedly responded with:

> Per the email that I sent earlier today (attached), per district School Board policy, employees CANNOT pray with or in the presence of students. You cannot have a student group AND staff group both praying at the pole as this would be a violation of Board policy. See You At The Pole is a student-initiated event (not staff initiated) and student-let event (not staff led). Even though it is before the school day, you are on campus visible to students in your role as an employee.
>
> You cannot "ask students to attend" SYATP as that would be initiating and promoting the event. A student met with me today. He provided the appropriate request, and I approved his request to hold a student-led SYATP tomorrow. Mr. Thomas will be the faculty monitor.

[ROA.12]. In her response to his email, Barber allegedly wrote: "Mr. Rounds, I didn't ask the students to attend. It is only for staff before students arrive just like we have done the past three years. . . . There will be no kids when we are out there." [ROA. 12].

Since the students were approved to start gathering at the pole for SYATP at 8:00 am, Rounds responded to Barber's email with: "By 8:00 AM students are generally waiting at the front entry of the building." [ROA.13, 181].

On the morning of Wednesday, September 27, Rounds noticed Barber and two other teachers standing at the flagpole during the time that the students were scheduled to use that space. [ROA.13, 254]. In order to avoid staff and students mixing at the

event, and to stay in compliance with district policy and procedures, Rounds asked the teachers if they would step into the conference room, and he reminded them that he sent an email stating that staff are not permitted to pray with students. [ROA.13, 254]. He also told them that he was not denying their right to pray, but that they needed to use another location, such as their classroom, since the flagpole area had been approved for the students to hold SYATP. [ROA.254-255]. Barber does not allege that Rounds disciplined her or issued any formal reprimand because of her involvement with SYATP. She alleges that Rounds later met with her on October 19, 2023, but this meeting had to do with her ongoing attendance issues and had nothing to do with SYATP or praying at school. [ROA.14, 255].

Prior to SYATP, Barber met with a group of teachers to pray weekly. [ROA.16]. The group met in the school foyer, Barber's classroom, or other available spaces. [ROA.16]. Rounds never interfered with Barber's prayer group. He never prohibited or even insinuated that Barber could not pray or engage in Bible study at school, in compliance with district policy and procedures. [ROA.254-255]. Barber alleges she decided to stop having her prayer group after the SYATP event. However, Barber does not allege that Rounds told her to stop participating in the prayer group.

# SUMMARY OF THE ARGUMENT

The lower court erred as a matter of law when it denied Rounds qualified immunity and held that *Kennedy* clearly established that Rounds's conduct violated Barber's constitutional rights. The lower court came to this decision by improperly focusing on Barber's subjective belief that she could not pray at school, rather than Rounds's actual conduct, which is required under a qualified immunity analysis. As such, the lower court misapplied *Kennedy* because Kennedy engaged in private religious speech and prayed on his own. In contrast, Rounds prevented Barber from praying *with* students at a student-led event. Rounds's conduct did not violate Barber's constitutional rights. This is especially true given that Rounds's conduct complied with the Equal Access Act, which mandates that school employees only attend student activities in a non-participatory capacity, a point the lower court failed to address. Moreover, the law regarding both free speech and free exercise by employees while at school is not clearly established, particularly after *Kennedy* significantly changed the test for Establishment Clause violations. Rounds was also entitled to qualified immunity below on Barber's Fourteenth Amendment claims, because no facts were alleged that Rounds personally was involved in drafting the Employee Handbook, or that Rounds personally was motivated to treat Barber differently because of her religious activities.

Rounds is entitled to qualified immunity and this Court should reverse.

## STANDARD OF REVIEW

This Court reviews *de novo* a lower court's denial of a motion to dismiss based on qualified immunity. *De La Paz v. Coy*, 786 F.3d 367, 371 (5th Cir. 2015). Dismissal of a lawsuit on the pleadings is proper where there is either (1) lack of a cognizable theory of recovery or (2) the absence of sufficient facts alleged under a cognizable legal theory. *In re Baker Hughes Securities Litigation*, 136 F.Supp.2d 630, 636 (S.D. Tex. 2001) (citing *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)). While the Court must accept the plaintiff's factual allegations as true, the factual allegations must exist: "[d]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (quoting 2A *Moore's Federal Practice* § 12.07 [2.-5] at 12-91). In addition, what must be alleged are facts: "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Beavers v. Metropolitan Life Ins., Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citing *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)). A court considering a motion to dismiss may choose to begin by identifying pleadings that are not entitled to the assumption of truth because they are no more than conclusions. *Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

In a qualified immunity case, the burden of proof shifts:

> The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this

defense by establishing that the official's allegedly wrongful conduct violated clearly established law.

*Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992) (internal citations omitted). As this Court has previously noted, "We do *not* require that an official demonstrate that he did *not* violate clearly established federal rights; our precedent places that burden upon plaintiffs." *Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir. 1997) (emphasis added; internal quotation marks omitted); *see also Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## ARGUMENT & AUTHORITIES

This appeal presents a very simple issue: did a school principal violate a teacher's constitutional rights—or any clearly established rights—by prohibiting her from praying at the flagpole before school, since he had already given students permission to engage in their own religious speech at the same location? The Equal Access Act, which was then and is still valid federal law, directs that any school employee cannot be at a student-led event in any capacity other than a supervisory one, *see* 20 U.S.C. § 4071(c)(3), and *Kennedy*, which repeatedly disavowed that Coach Kennedy was praying *with* students, does not clearly establish that Rounds's actions that day were unconstitutional. Any attempt to portray Rounds as trying to prevent Barber from engaging in religious speech more generally founders on admissions Barber herself made, which the judge below noted in denying her request for a temporary injunction:

> Similar to *Lowery,* the only adverse action that Plaintiff has alleged in this case is a reprimand, which took place when Principal Rounds called her

8

in to stop participating in SYATP – a student-led, noncurricular event wherein a student group was approved to use school facilities for a designated period of time. Plaintiff engaged in religious activities at Cardiff prior to SYATP and had never encountered any issues or adverse action. Moreover, as Plaintiff conceded at the May 14 hearing, Plaintiff has not been subject to any adverse actions or been prohibited from engaging in any religious conduct since SYATP. In addition, as in *Lowery,* the only argument Plaintiff offers is that she has been self-censoring since SYATP. But her self-censor alone does not demonstrate that she is facing any 'imminent, non-speculative irreparable injury.'

[ROA.354-ROA.355]. Given these undisputed facts, Rounds did not violate Barber's clearly-established rights, and the judge below erred in denying him qualified immunity.

## A.    Qualified Immunity Standard

The Supreme Court has long held that public servants are immune from suit unless their conduct violated "clearly established" federal law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The availability of immunity is a question of law. *Siegert v. Gilley*, 500 U.S. 226, 231-232 (1991). Courts must determine (i) whether the plaintiff has described a violation of a constitutional right; and (ii) whether the right was "clearly established" at the time of the official's conduct. *Pearson v. Callahan*, 555 U.S. 223, 223-24 (2009). Courts may decide which of the two prongs should be decided first in light of the circumstances of the case. *Id.* at 225.

To defeat qualified immunity, the plaintiff must show that the official's conduct was objectively unreasonable in light of a clearly established rule of law. *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). Because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v.*

*Briggs*, 475 U.S. 335, 341 (1986), the courts do not deny its protection unless existing precedent places the constitutional question "beyond debate." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (*en banc*) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731 (2011)). The court must "ask whether the law so clearly and unambiguously prohibited [the official's] conduct that *every* reasonable official would understand that what he is doing violates [the law]." *Id.* (citing *al–Kidd*, 563 U.S. at 739) (emphasis in original).

The plaintiff must identify the violation of a "particularized" right. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). And, the plaintiff must show that the "contours" of the right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Alexander v. Eeds*, 392 F.3d 138, 146 (5th Cir. 2004). This means that "existing precedent" must have placed the constitutional question "beyond debate." *Al-Kidd*, 563 U.S. at 741.

Ultimately, for an official to lose qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) (citations omitted); *Stefanoff v. Hays Cnty.*, 154 F.3d 523, 525 (5th Cir. 1998). Accordingly, the qualified immunity standard "gives ample room for mistaken judgments." *Malley*, 475 U.S. at 343. "This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citations omitted). Even

in cases where the official is on notice that his conduct *might* be a violation, he is still entitled to immunity if the question is still open at the time that he acts. *See, e.g., Forsyth*, 472 U.S. at 535.

**B.** **Rounds was entitled to qualified immunity below, because the facts of this case differ significantly from those of *Kennedy*.**

Barber pled that Rounds tried to keep teachers and students separate during a non-curricular student activity that had been pre-approved for the students. This conduct does not violate Barber's constitutional rights, even after *Kennedy*. While the new Establishment Clause test proposed by *Kennedy* is difficult to apply, it is clear that the facts of the case were important to its outcome: that Coach Kennedy "offered his prayers quietly while his students were otherwise occupied." *Kennedy*, 597 U.S. at 513-514. The majority opinion stresses twenty-six times (by the undersigned's count) that Kennedy, the school district, and the Court all agreed that "Mr. Kennedy prayed on his own," while students were engaged in other activities. *Id.* at 514. This was a key point in Kennedy's own arguments:

> Mr. Kennedy emphasized that he sought only the opportunity to "wai[t] until the game is over and the players have left the field and then wal[k] to mid-field to say a short, private, personal prayer." He "told everybody" that it would be acceptable to him to pray "when the kids went away from [him]." He later clarified that this meant he was even willing to say his "prayer while the players were walking to the locker room" or "bus," and then catch up with his team.

*Id.* at 517 (internal record cites omitted). The Court, in finding that Kennedy had engaged in *private* religious speech under the Free Exercise Clause, stressed these same points:

> The exercise in question involves, as Mr. Kennedy has put it, giving "thanks through prayer" briefly and by himself "on the playing field" at the conclusion of each game he coaches. Mr. Kennedy has indicated repeatedly that he is willing to "wai[t] until the game is over and the players have left the field" to "wal[k] to mid-field to say [his] short, private, personal prayer." The contested exercise before us does not involve leading prayers with the team or before any other captive audience. Mr. Kennedy's "religious beliefs do not require [him] to lead any prayer ... involving students." At the District's request, he voluntarily discontinued the school tradition of locker-room prayers and his postgame religious talks to students. The District disciplined him only for his decision to persist in praying quietly without his players after three games in October 2015.

*Id.* at 525-26 (internal record cites omitted).

Turning to the Free Speech Clause, the Court stressed that "Mr. Kennedy offered his prayers when students were engaged in other activities like singing the school fight song [which] further suggests that those prayers were not delivered as an address to the team, but instead in his capacity as a private citizen." *Id.* at 530. His speech could not have been coercive (in the constitutionally-impermissible sense), said the Court, because "Mr. Kennedy did not seek to direct any prayers to students or require anyone else to participate. His plan was to wait to pray until athletes were occupied, and he 'told everybody' that's what he wished 'to do.'" *Id.* at 538. And in finding that Kennedy did not violate whatever the Establishment Clause's new standard may mean, the Court stressed:

The prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience. Students were not required or expected to participate. And, in fact, none of Mr. Kennedy's students did participate in any of the three October 2015 prayers that resulted in Mr. Kennedy's discipline.

*Id.* at 542.

By contrast, Barber sought to participate in a primarily student-oriented event – or, to be charitable, to conduct her own "See You at the Pole" at the same time and in the same place as a group of students doing the same thing. The *Kennedy* Court, in finding that Kennedy's "short, private, personal prayer," *id.* at 517, was constitutional, noted that "this case looks very different from those in which this Court has found prayer involving public school students to be problematically coercive," *id.* at 541, and cited to two Supreme Court cases: *Lee v. Weisman*, 505 U.S. 577 (1992) and *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000). Both of theses cases involved large student-oriented events (graduation ceremonies and football games), and both found that prayer at those events was constitutionally impermissible. Although those two cases are admittedly older, neither relied significantly on the disgraced *Lemon* test,[1] and the *Kennedy* Court appears to at least have approved of the outcome of those cases, if not their strict constitutional analysis. *See Kennedy*, 597 U.S. at 541-42.

---

[1] *See Lee*, 505 U.S. at 587 ("We can decide the case without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured. Thus we do not accept the invitation of petitioners and *amicus* the United States to reconsider our decision in *Lemon v. Kurtzman*…."). *Santa Fe ISD* does contain a short *Lemon* analysis towards the end of the decision, *see* 530 U.S. at 314, but only after the Court had already concluded that the football prayer policy was constitutionally indistinguishable from the graduation prayer policy in *Lee*.

Moreover, teachers are exempt employees under the Fair Labor Standards Act since they frequently do official work outside the normal school hours: they supervise extracurricular activities after school, they grade papers at night, and they chaperon field trips on the weekends. Meaning, Barber cannot argue that any participation in SYATP must have been private because it was minutes before her "workday" (or contract hours). While *Kennedy* stressed that a school should not fire a teacher for engaging in a short prayer before eating, just because the teacher is technically "on the clock" at lunch, *see Kennedy*, 597 U.S. at 531, the converse would also be true: a teacher who chooses to work outside the normal "workday" hours cannot argue that she is engaging in private activity, if she is actually doing her job. Since Barber could only have been present at the student event in a supervisory capacity under the Equal Access Act (see below), she was not present as a private citizen.

The lower court held that *Kennedy* applied to this case because it focused on Barber's allegations that she *thought* Rounds's statements about SYATP meant she could no longer pray at school, instead of focusing on Rounds's actual conduct. This was improper because Barber's subjective beliefs are irrelevant under a qualified immunity analysis. Barber had the burden to prove that Rounds's conduct violated clearly established law. *Pierce,* 117 F.3d at 872. She failed to meet this burden because she exclusively relied on *Kennedy* to support her claims against Rounds. But because SYATP was a student-led non-curricular activity, *Kennedy* does not apply. Put another way, *Kennedy* would only apply if Rounds affirmatively prevented Barber from ever praying

at school. He did not. Rounds's email to Barber specifically focused on the SYATP event. [ROA.11-13]. Barber admitted that prior to SYATP, she was able to pray at school without Rounds's interference. [ROA.16]. There is simply no evidence or allegations that Rounds barred her from praying at school before *or* after SYATP. Instead, the evidence and allegations show that he asked her not to pray with students at the SYATP event. As noted above, this did not violate Barber's constitutional rights. Therefore, the lower court misapplied *Kennedy*, and Rounds is entitled to qualified immunity because he did not violate Barber's constitutional rights in the first place— failing the first prong of the qualified immunity test. *See Pearson*, 555 U.S. at 223-24.

**C.   Rounds was entitled to qualified immunity below, because his conduct was in line with the Equal Access Act.**

While it is true that "[a] government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,'" *Kennedy*, 597 U.S. at 526 (quoting *Fulton v. Philadelphia*, 593 U.S. 522, 534 (2021)), the problem faced by Rounds was that Barber sought to engage in an activity at the same time and location that students had already reserved for their own non-curricular (and preapproved) student activity.   Under the Equal Access Act, which prohibits schools from denying "equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings,"  <u>any presence by a</u>

teacher at a non-curricular student activity is required to be in a supervisory or a "nonparticipatory" capacity. 20 U.S.C. § 4071(a); (c)(3) (emphasis added); *see also Sease v. Sch. Dist. of Philadelphia*, 811 F. Supp. 183 (E.D. Penn. 1993) (where a school gospel choir was led by the school secretary, the school properly refused to allow the choir use of its building under the Equal Access Act).

As discussed above, if a teacher were at a non-curricular student activity in a supervisory capacity (the only capacity permitted by the Equal Access Act), she would have been there in an official capacity, and "the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy*, 597 U.S. at 527 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).

Here, SYATP is a student event, [ROA.11, 253], and members of the public are not generally allowed on school property to gather around the flagpole as the staff and students are trying to start the school day.[2] The lower court did not address application of the Equal Access Act when it denied Rounds's entitlement to qualified immunity, even though the Defendants argued it. [*See* ROA.212]. That was an error given that Barber was statutorily required to only attend SYATP in a nonpartcipatory or supervisory capacity. 20 U.S.C. § 4071(c)(3). Consequently, her rights were not violated, and Rounds's entitlement to qualified immunity should remain intact.

---

[2] To a degree, this distinguishes this case from the setting in *Kennedy*, which was at a football stadium where members of the public would regularly attend school-sponsored sporting events.

**D. Rounds was entitled to qualified immunity below, because the lower court incorrectly found that *Kennedy* clearly established that Rounds's conduct violated Barber's constitutional rights.**

Rounds asserted his qualified immunity defense because the law regarding both free speech and free exercise by employees while at school is not clearly established, particularly after *Kennedy* significantly changed the test for Establishment Clause violations.[3] The lower court could and should have resolved the qualified immunity defense on the "clearly established" prong. *See Camreta v. Greene*, 563 U.S. 692, 707 (2011) (recognizing that "courts should think hard, and then think hard again, before turning small cases into large ones").

By analogy in the school context, in 2019, this Court held that school officials were entitled to qualified immunity when deciding whether to punish a cheerleader for online speech because of the lack of clarity and guidance to school officials regarding when they could discipline students for off-campus speech. *See Longoria v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 269 (5th Cir. 2019). Since *Longoria*, the only major case involving online student speech that *might* have provided guidance to Texas school officials was *Mahanoy*, but the Supreme Court specifically declined to provide a definitive test for determining when and to what extent schools can

_____

[3]Courts are still trying to interpret the reach of *Kennedy*'s new Established Clause test. *See e.g.*, *Roake v. Brumley*, 141 F.4th 614, 642-643 (5th Cir. June 20, 2025) (holding that *Stone v. Graham*, 449 U.S. 39 (1980) remains good law notwithstanding its reliance on *Lemon v. Kurtzman*).

discipline students for off-campus speech. And, in doing so, it confirmed that the law in this context is anything but well-established:

> Given the many different kinds of off-campus speech, the different potential school-related and circumstance specific justifications, and the differing extent to which those justifications may call for First Amendment leeway, we can, as a general matter, say little more than this: Taken together, these three features of much off-campus speech mean that the leeway the First Amendment grants to schools in light of their special characteristics is diminished. **We leave for future cases to decide were, when, and how these features mean the speaker's off-campus location will make the critical difference**.

*Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 190 (2021) (emphasis added). But even after both *Longoria* and *Mahanoy*, this Court held again in 2023 that a school principal did not violate a student's free speech rights by disciplining him for a social media post that included a racially-tinged threat to another student, because the law was still not clearly established. *See McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1009 (5th Cir.), *cert. denied,* 144 S. Ct. 348 (2023) ("Even *Mahanoy*, which was decided after the underlying incidents here, offers little assistance.")

Like *Mahanoy*, *Kennedy* does not establish a clear, easily understood test for school officials to apply to employee speech in all situations. *Kennedy* suggests that courts (and presumably middle school principals) should look to "historical practices and understandings", and that the line that courts and governments "must draw between the permissible and the impermissible" has to "accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers." *Kennedy*, 597 U.S. 535–36 (citing *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). Later that year, the Supreme Court

made clear that "history and traditions" is the proper test for all constitutional analysis

in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), a Second

Amendment case. But courts have already bemoaned the difficulties of actually using

this test to apply to real life situations before them:

> The Court is staffed by lawyers who are neither trained nor experienced in
> making the nuanced historical analyses called for by *Bruen*.... The analytical
> construct specified by Bruen is thus a difficult one for non-historians.

*Fraser v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 672 F.Supp.3d 118, 137, n. 20

(ED Va. 2023). If courts and their staff have trouble performing the sort of historical

analysis called for by cases like *Kennedy* and *Bruen*, then how was Scott Rounds supposed

to know whether *Kennedy* prohibited his behavior outside of its specific facts – a coach

praying by himself at the fifty yard line of a football field with nobody else around?

Ultimately this case comes down to balancing the free exercise/speech rights of

Rounds against the Establishment Clause responsibilities of the District, and as this

Court has previously noted in analogous First Amendment employment retaliation

claims, such situations are rarely clearly established:

> One consequence of case-by-case balancing is its implication for the
> qualified immunity of public officials whose actions are alleged to have
> violated an employee's First Amendment rights. There will rarely be a
> basis for *a priori* judgment that the termination or discipline of a public
> employee violated "clearly established" constitutional rights.

*Noyola v. Texas Dep't of Human Res.*, 846 F.2d 1021, 1025 (5th Cir.1988); *see also Kinney*

*v. Weaver*, 367 F.3d 337, 387 (5th Cir. 2004); *Kincade v. City of Blue Springs, Mo.*, 64 F.3d

389, 398 (8th Cir. 1995) ("[W]hen *Pickering* 's fact-intensive balancing test is at issue, the asserted First Amendment right 'can rarely be considered "clearly established" for purposes of the *Harlow* qualified immunity standard.'").

Ultimately, there are no cases yet that would establish that *every* teacher has a "clearly protected right" to participate in a student-initiated SYATP event. In fact, while SYATP has become a fairly common student event around the country, courts have routinely ruled that teachers can monitor the event, but not participate in the event. In *Daugherty v. Vanguard Charter Sch. Academy*, 116 F.Supp.2d 897 (W.D. Mich. 2000), a student witnessed about 8-10 students and at least two teachers sitting and praying at the flagpole outside her school at about 7:30 a.m. She testified that the flagpole gatherings took place about once a month. The court noted that "[t]he presence of teachers and elementary students together, for prayer, on school premises, albeit during non- instructional hours, is a matter of heightened concern." *Id.* at 910. The court then said this about the proper role of the teachers at the gatherings:

> Thus, if the teachers attended the flagpole gatherings strictly in a passive or supervisory capacity without participating in the prayer, their mere presence would not be violative of the Establishment Clause. If, on the other hand, the teachers played a more active, participatory role in the prayer gathering, of which there is no evidence, then plaintiffs' claim would be stronger.

*Id.* at 911..

Likewise, in *Doe v. Wilson County School System*, 564 F.Supp.2d 766, 801-803 (M.D. Ten. 2008), plaintiffs complained about the school's involvement in both See You at the Pole and National Day of Prayer events. The evidence showed that although the events took place before school and on school property, they were organized and paid for by an outside group called "Praying Parents." No school administrators or teachers planned, organized, or led the events. The Court agreed with the school that the school could allow student groups to engage in morning prayer activities at the school flagpole, so long as they were student-initiated and student-led (calling this a "critical fact"). The Court also did not seem to have a problem with the school allowing an outside group of parents to hold similar prayer activities at the flagpole.

What bothered the Court, however, was the school's involvement in these activities. The school sent home flyers and allowed posters to be hung in the school that, although paid for by the Praying Parents group, did not indicate that the events were sponsored by a third party. The principal also allowed a poster contest to promote the National Day of Prayer, with student posters with religious content and symbols also being hung in the halls. The Court concluded that "[a] reasonable observer could thus assume that Lakeview [the school] sponsored the events." *Id.* at 801-02. Even more troubling to the Court was the fact that Lakeview teachers participated in the events:

> Marlowe and Adamson claimed that they attended in part to supervise students. They did not speak or lead the group in prayers, but like other participants, they bowed their heads when prayers were offered and wore

"I Prayed" stickers during instructional time following the National Day of Prayer. The young students and their parents understandably could have thought that the teachers and school principal were present as representatives of the school and as such their actions were an endorsement of the religious event. Their actions crossed the line of permissible supervision of the students at the event and signaled to others that they supported the Praying Parents who sponsored and participated in these Christian events. A reasonable observer could conclude that Lakeview sponsored or endorsed the religious events, or that the school is excessively entangled with religion.

School teachers and administrators do not shed their own First Amendment rights to exercise their religion at the school entrance. However, Lakeview teachers and administrators may not participate in student-initiated prayers in their official capacities. The school must strike a careful balance between the Free Exercise rights of teachers and administrators and the commands of the Establishment Clause. Where there is tension between the two, Establishment Clause concerns take precedence.

*Id.* at 802-803 (internal citations omitted).

*Daughtery* and *Wilson County* are consistent with a number of pre-*Kennedy* cases that have held that school employees do not have a First Amendment right to participate in prayer with students, beyond a fairly passive monitoring. In the seminal case of *Doe v. Duncanville ISD*, 70 F.3d 402 (5th Cir. 1995), a student brought suit against Duncanville ISD, challenging the girls' basketball team's twenty-year practice of holding prayers at each practice, in the locker room before games, at center court after games, and on the bus traveling to and from games. The coach either initiated or participated in the prayers. After the plaintiff complained to her coach, the student was made to stand off to the side while the team continued to pray.

The trial court ruled in favor of the student and entered an injunction prohibiting employees from "leading, encouraging, promoting, or participating in prayers with or among students during curricular or extracurricular events." On appeal, the school challenged the prohibitions on participation and supervision. The Fifth Circuit disagreed with the school that prohibiting employees from participating in the prayers would violate the employees' rights to the free exercise of religion, to association, to free speech and academic freedom. The Court noted that because the prayers took place during school-controlled, curriculum-related activities that members of the basketball team were required to attend, "DISD coaches and other school employees are present as representatives of DISD policies." *Id.* at 406. Thus, they could not participate in the prayers. While the Court noted that employees were not required to make their non-participation "vehemently obvious or to leave the room students pray in," if the employees were to "join hands in a prayer circle or otherwise manifest approval and solidarity with student religious exercises, they cross the line between respect for religion and endorsement of religion." *Id.* at 406 n.4.

In a more recent case of *Borden v. School District of the Township of East Brunswick*, 523 F.3d 153 (3rd Cir. 2008), a high school football coach brought suit after his school principal told him to stop participating in various prayer events related to the football team. For twenty-three seasons, Coach Borden and the team engaged in pre-game prayer activities at a team dinner and prior to games in the locker room. Originally a local minister led the pre-meal prayer; starting in 1997, at the request of the athletic

director, the minister stopped attending but drafted a prayer for Coach Borden or one of his team members to say. Borden himself led the prayers in the locker room. After a number of student complaints in 2005, the principal told Borden that he could no longer lead the prayers. At the next team dinner, Borden told the students that if they were uncomfortable, they could wait in the restroom until the prayers were over. That generated even more complaints, and the Superintendent told Borden that he needed to disassociate himself completely from the prayers, which would truly need to be student-initiated and student-led. A memo generated by the school attorney cited the *Duncanville ISD* decision and stated that employees cannot participate in student-initiated prayer, and that "[i]f while acting in their official capacities (school district) employees join hands in a prayer circle or otherwise manifest approval and solidarity with student religious exercises, they cross the line between respect for religion and endorsement of religion," and that such conduct was prohibited. Specifically, Borden was told he could not silently bow his head during his team's pre-meal grace, or take a knee with his team during a locker-room prayer.

The Court of Appeals ruled in favor of the school. Citing the Fifth Circuit's *Duncanville ISD* decision, the Court found that the policy was neither unconstitutionally overbroad nor void for vagueness. The Court rejected Borden's free speech claim, noting that a public employee's free speech rights are limited, and his religion claims, holding that the school had a legitimate educational interest in

avoiding Establishment Clause violations, and the guidelines were reasonably related to that interest.

Rounds acknowledges that these are older cases, and that they may or may not survive *Kennedy*. But what is clear is that there was no caselaw that existed in the fall of 2023 such that "every reasonable official would have understood that what he is doing violates that right," *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 4 (2021). It is simply not clearly established that trying to keep teachers and students separate during a non-curricular student activity that had been pre-approved would violate a teacher's constitutional rights, even after *Kennedy*. To that end, the lower court erred in denying Rounds his entitlement to qualified immunity from Barber's federal constitutional claims.

**E.  Rounds was entitled to qualified immunity below on Barber's Fourteenth Amendment claims, because no facts were alleged that Rounds personally was involved in drafting the Employee Handbook, or that Rounds personally was motivated to treat Barber differently because of her religious activities.**

Although the court below did not specifically address Rounds's entitlement to qualified immunity on Barber's Fourteenth Amendment claims, Rounds moved for qualified immunity below on all of Barber's constitutional claims. [ROA.205-ROA.212]. The court granted the Motion to Dismiss on the merits of Barber's void-for-vagueness claim, finding that Barber "failed to allege that the Employee Handbook's 'Religion in the Schools' provision is 'impermissibly vague in all of its applications'," and that she

did not allege that she was "deprived of a constitutionally-protected property or liberty interest." [ROA.393]. The court declined to address the overbreadth claim as to the Employee Handbook – but there are no allegations that Rounds had anything to do with drafting the Employee Handbook. In order to state a claim against Rounds *individually*, Barber would have to have alleged facts demonstrating that Rounds was *personally* involved in violating her Fourteenth Amendment rights. *See Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005); *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, 919 F.Supp.2d 787, 811 (E.D. Tex. 2013). Assumptions, speculative allegations and the like are not enough to overcome Rounds's entitlement to qualified immunity. *Iqbal,* 556 U.S. at 676 ("[B]ecause vicarious liability is inapplicable to. . .§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Because there are no facts alleged that Rounds had anything to do with drafting the Employee Handbook, Rounds would be entitled to qualified immunity on any overbreadth claim against him.

Likewise, the court below denied the Motion to Dismiss on Barber's Equal Protection claim on the basis that the Complaint alleged that Barber was "singl[ed] out" for praying in the presence of students and that "Defendants did not 'similarly disciplin[e] other employees for their religious activities, such as the many staff members across campuses who participate in the religious activities of other student groups." [ROA.394-ROA.395 (citing Doc. #1, ¶ 75)]. While that may have sufficed to state a claim against the District, it was insufficient to state a claim against Rounds

individually, because there are no allegations that Rounds himself failed to discipline other employees for engaging in conduct similar to that of Barber. As noted above, the lower court found that Barber had conceded that Rounds's actions towards her were limited to the single SYATP event; that she had "engaged in religious activities at Cardiff prior to SYATP and had never encountered any issues or adverse action" and that "Plaintiff has not been subject to any adverse actions or been prohibited from engaging in any religious conduct since SYATP." [ROA.354-ROA.355]. Because Barber does not allege facts that would plausibly suggest that Rounds individually treated her differently than similar-situated individuals as to the SYATP event because of her religion or religious activities, she cannot make out an equal protection claim against him individually, and qualified immunity was proper on that claim as well. *See Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (to state an equal protection claim, a plaintiff must allege that she (1) "received different treatment from that received by similarly situated individuals and that (2) the unequal treatment stemmed from a discriminatory intent.").

## CONCLUSION AND PRAYER

For the reasons stated above, Appellant Bryan Scott Rounds was entitled to qualified immunity as a matter of law on Barber's constitutional claims. Rounds respectfully requests that this Court grant his appeal, reverse the relevant rulings of the court below and render him qualified immunity, grant Rounds his costs of appeal, and

grant Rounds such relief, both at law and in equity, to which he has shown himself justly entitled.

Respectfully submitted,

**THOMPSON & HORTON LLP**

By: */s/ Christopher B. Gilbert*
    Christopher B. Gilbert
    Texas Bar No. 00787535
    cgilbert@thompsonhorton.com
    Alexa Gould
    Texas Bar No. 24109940
    agould@thompsonhorton.com

3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
Telephone: (713) 554-6714
Facsimile: (713) 583-8884

ATTORNEYS FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been forwarded to the following counsel and/or parties of record by electronic service on July 30, 2025:

Brett B. Stalcup
STALCUP LAW
3811 Turtle Creek Blvd. Suite 175
Dallas, Texas 75219
Email: bstalcup@stalcuplaw.com

Jay Alan Sekulow
Jordan Sekulow
Stuart J. Roth
Christina A. Compagnone
Geoffrey Surtees
Nathan Moelker
AMERICAN CENTER FOR LAW AND JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Email: nmoelker@aclj.org

By: /s/ Christopher B. Gilbert
       Christopher B. Gilbert

# CERTIFICATE OF COMPLIANCE

Pursuant to 5TH CIR. R. 32.2 and .3, the undersigned certifies this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7).

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5TH CIR. R. 32.2, THE BRIEF CONTAINS (select one):

   A. <u>7288 </u>words, OR

   B. _____ lines of text in monospaced typeface.

2. THE BRIEF HAS BEEN PREPARED (select one):

   A. in proportionally spaced typeface using:

   Software Name and Version: **Microsoft Word 2506**

   in (Typeface Name and Font Size): **Garamond 14 pt**

   OR

   B. in monospaced (nonproportionally spaced) typeface using:

   Typeface name and number of characters per inch:

3. THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN FED. R. APP. P. 32(a)(7), MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

By: */s/ Christopher B. Gilbert*
Christopher B. Gilbert